## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| DANIEL LABRAKE,<br>Petitioner,<br><br>v.<br><br>PAUL STOWITZKY, *et al.*,<br>Respondents. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION<br><br>NO. 07-00212 |

## Memorandum

YOHN, J.                                                                September 3, 2009

Presently before the court is petitioner Daniel LaBrake's motion for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  LaBrake is currently serving a term of ten to twenty years' imprisonment for the third-degree murder of his estranged wife and for possession of an instrument of crime.  After conducting a de novo review of the Report and Recommendation of United States Magistrate Judge Henry S. Perkin, and upon consideration of petitioner's objections thereto, I will overrule petitioner's objections, adopt in substantial part the Report, and approve the Recommendation.  I write separately only to address certain issues petitioner raised in his objections to the Report and Recommendation.

## I.      Factual and Procedural Background

On direct appeal, the Pennsylvania Superior Court adopted the trial court's statement of the facts, which provides:

At the time of the crime, [petitioner] and the victim, Roseann LaBrake, had

1

been married for over twenty years.  In the months leading up to the shooting, however, Mrs. LaBrake had become unhappy in the marriage and expressed her wish to separate.  The evidence showed that, in the year leading up to the separation, Mrs. LaBrake had developed a relationship over the internet with a man in Missouri.  It was upon being confronted with this relationship that she told [petitioner] she wanted to separate.

Less than a month prior to the shooting, Roseann LaBrake moved out of the marital home and established her own residence.  Roseann first returned to the home May 2, 1998.  On that occasion . . . [she] arrived with a police escort. . . . After [Roseann] entered the home, however, some disagreement arose concerning whether Roseann would be allowed to take certain photo albums and family videotapes. [Petitioner] refused to allow her to remove these items.

Officer [Gina] DeAngelo and her partner advised both parties that they would have to consult their respective attorneys concerning any disputed property, and only agreed upon items could be removed at that time.  The officers further stated that they would be unable to supervise the entire process.  Before they left, the victim [Roseann LaBrake] told the officers that [petitioner] kept a handgun in the house. Upon questioning, [petitioner] admitted that he kept a gun but that it was unloaded and the ammunition was kept in a different location from the firearm.

On the day of the murder, May 28, 1998, Roseann LaBrake returned to the marital home to pick up some personal belongings and to drop off some of [petitioner's].  Early that morning, [petitioner] had called Roseann and told her that she could come over after work to pick up the video camera and one or more of the family photo albums that had been a subject of dispute.  Though she had an appointment at five o'clock in the afternoon and wanted to arrive at the house after that time, [petitioner] convinced her to come before her appointment.  He stated that he didn't want their younger daughter, Michelle, to be home, because he didn't want her to hear them arguing.

The evidence showed that Roseann LaBrake entered the marital home at approximately 4:29 pm, carrying a box of items she had agreed to return to her husband.  Less than five minutes later, she was dead from a single gunshot wound to the head.  A second shot had lodged in one of the family photo albums that had been a subject of contention during her first return to the home.

At 4:32 pm, [petitioner] called 911 and reported the shooting, claiming that his wife had shot herself.  He repeated this claim to a neighbor, Richard Holloran, who was the first person to arrive on the scene . . . .

Richard and Laurence Holloran were watching television when they heard

two gunshots from next door, separated by a short pause. . . . Richard ran next door to investigate and met [petitioner] at his front door, where [petitioner] told Holloran that his wife had shot herself.  Together, they went upstairs to the LaBrake's former bedroom, where Roseann lay dead in a pool of blood.

Gregory Meissler, an off-duty police officer, was across the street at his ex-wife's house [when he] observed Richard Holloran, with whom he was acquainted, running into the LaBrake house.  Believing that there was some emergency, he crossed the street to investigate . . . .

Meissler entered the home and announced himself as a police officer, and Richard Holloran called him up to the bedroom.  Upon entering the bedroom, Officer Meissler went over to Roseann LaBrake's body and determined that she was dead. He asked the [petitioner] where he was at the time of the shooting, and [petitioner] answered, "I don't remember." [Petitioner] also claimed not to remember whether he saw his wife shoot herself or whether he touched anything.

[Petitioner] was transported to the police station for questioning.  Early the next morning, between 4:00 and 5:00 am, [petitioner] was released.  Police Officer Stan Davis and his partner were directed to drive him home.  During the ride, [petitioner] repeatedly blurted out "I can't believe they let me go." [These statements were not made in response to any questioning by Officer Davis or his partner.] Eventually, on the fourth or fifth repetition, Officer Davis told [petitioner] that if he didn't do anything he had nothing to worry about. [Petitioner] replied, "I have a lot to worry about." [Petitioner] then stated that he guessed he should get a lawyer, and Officer Davis concurred.

At trial, the defense advanced the theory that it was actually the victim who had the gun.  According to this theory, after the victim had fired one shot at [petitioner], the two struggled for the gun, and Mrs. LaBrake was shot accidently during the struggle . . . . The jury rejected the defense theory . . . .

*Commonwealth v. LaBrake*, No. 523 EDA 2001, slip op. at 1-4 (Pa. Super. Ct. Sept. 5, 2003)

(internal quotation omitted).  When discussing the sufficiency of the evidence supporting

petitioner's conviction, the trial court further detailed the evidence introduced at trial:

Significantly, the testimony suggests that the evidence at the scene was tampered with; that the gun was moved and the victim's body was arranged so as to suggest suicide.

In addition, [petitioner] made several contradictory and self-incriminating

3

statements from the time of the shooting to early the next morning.  Initially, he told the 911 operator and his neighbor that his wife shot herself.  Shortly thereafter, when an off-duty police officer arrived on the scene, he claimed not to know what had happened.  Then, while speaking to an emergency medical technician at the scene, he stated, "I did it. I did it."  Some twelve hours later, while being driven home by police officers, he repeated[ly] blurted out, "I can't believe they let me go."

*Commonwealth v. LaBrake*, No. 0245, slip op. at 9-10 (Pa. Ct. Com. Pleas Cr. Div. Mar. 7, 2002)

(internal quotation omitted).

Ultimately, petitioner was convicted of third-degree murder and sentenced to serve ten to twenty years' imprisonment.  After pursing both a direct appeal and post-conviction relief, petitioner timely[1] filed his habeas petition on January 17, 2007.  On March 16, 2007, petitioner filed an amended habeas petition raising these eleven claims:

(1) Petitioner's conviction was obtained in violation of his Fourteenth Amendment right to due process and his Fifth Amendment right to a fair trial because the prosecutor repeatedly commented on petitioner's failure to testify;

(2) Petitioner's conviction was obtained in violation of his Fourteenth Amendment right to due process and his Fifth Amendment right to a fair trial because the prosecutor made inflammatory and prejudicial statements to the jury that were not supported by the facts of the case;

(3) Petitioner's conviction was obtained in violation of his Fourteenth Amendment right to due process and his Fifth Amendment right to a fair trial because the prosecutor improperly cross-examined a defense witness through the introduction of a materially false statement;

(4) Petitioner's conviction was obtained in violation of his Fourteenth Amendment right to due process and his Fifth Amendment right to a fair trial because the trial court failed to suppress certain of petitioner's statements to the police;

---

[1]  The government does not contest the issue of timeliness.  Upon review, the court concludes that petitioner timely filed his habeas petition.  *See* 28 U.S.C. § 2244(d)(2) (excluding from one-year statute of limitations time "during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending").

(5) Petitioner's conviction was obtained in violation of his Fourteenth Amendment right to due process and his Fifth Amendment right to a fair trial because of the cumulative effect of the prosecutor's misconduct;

(6) Petitioner's conviction was obtained in violation of his Sixth Amendment right to effective assistance of counsel because trial counsel failed to object to a jury instruction that shifted the burden of proof to the petitioner regarding his version of the events;

(7) petitioner's conviction was obtained in violation of his Sixth Amendment right to effective assistance of counsel because trial counsel failed to object to a jury instruction "regarding the believability of witnesses because such instructions deprived petitioner of an accurate jury instruction as it relates to reasonable doubt";

(8) Petitioner's conviction was obtained in violation of his Sixth Amendment right to effective assistance of counsel because trial counsel failed to object to a jury instruction regarding circumstantial evidence where the instruction "imposed burden on defense testimony to be 'truthful'";

(9) Petitioner's conviction was obtained in violation of his Sixth Amendment right to effective assistance of counsel because "trial counsel failed to object to trial court's instruction on reasonable doubt wherein said instruction deprived petitioner of reasonable doubt";

(10) Petitioner's conviction was obtained in violation of his Fourteenth Amendment right to due process and his Fifth Amendment right to a fair trial because the evidence offered at trial was insufficient to support his conviction;

(11) Petitioner's conviction was obtained in violation of his Sixth Amendment right to effective assistance of counsel because his direct appeal counsel failed to raise certain claims in petitioner's direct appeal.[2]

---

[2] Petitioner raised the first ten claims in his direct appeal or his PCRA appeal. Therefore, these ten claims are exhausted. *See Williams v. Folio*, No. 07-1099, 2008 WL 336306, *3 (E.D. Pa. Feb. 4, 2008) (stating that "a habeas petitioner successfully exhausts a claim by bringing it to the Superior Court either on direct appeal or during PCRA proceedings"). Conversely, petitioner concedes in his objections to the Report and Recommendation that he did not develop his eleventh claim in state court, and, consequently, that he is barred from raising it here. *See Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) (reasoning that when "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred . . . there is a procedural default for purposes of federal habeas").

(Pet.'s Am. Habeas Pet. 2-6.)  Respondents filed their response on July 12, 2007, to which petitioner replied on August 20, 2007.  The case was referred to Magistrate Judge Henry S. Perkin, who issued a Report and Recommendation on January 30, 2009.  Petitioner filed objections to the Report and Recommendation on March 6, 2009, and the government responded on April 20, 2009.  This case was re-assigned to my docket on July 16, 2009.

## II.    Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. §§ 2241 *et seq.*, governs the court's review of this habeas petition.  Under AEDPA, a "district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  *Id.* § 2254(a).  Habeas relief is unwarranted "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

Pursuant to § 2254(d)(1), a state court decision is "contrary to" Supreme Court precedent if the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law or if the state court decides the case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Terry Williams v. Taylor*, 529 U.S. 362, 413 (2000) (interpreting § 2254(d)(1)); *see Marshall v. Hendricks*, 307 F.3d 36, 51 (3d Cir. 2002).  An "unreasonable application" of federal law occurs when "the state court identifies the correct

governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Terry Williams*, 529 U.S. at 413.  Under § 2254(d)(2), "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Lambert v. Blackwell*, 387 F.3d 210, 234 (3d Cir. 2004) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).  "'Yet, deference does not imply abandonment or abdication of judicial review. . . . In other words, deference does not by definition preclude relief.'"  *Id.* at 234-35 (quoting *Miller-El*, 537 U.S. at 340) (internal quotation and alteration omitted).

## III.  Discussion

The magistrate judge recommends that the court deny each of petitioner's eleven claims. Petitioner asserts the following objections:

(1) the magistrate judge's conclusions are "lifted wholly from legal conclusions found" in the government's brief, entitling petitioner to an independent review";

(2) the magistrate judge erred in rejecting petitioner's prosecutorial misconduct claims;

(3) the magistrate judge erred in rejecting petitioner's claims that certain statements made by the prosecutor were so prejudicial as to mandate relief;

(4) the magistrate judge erred in rejecting petitioner's claim that the prosecutor improperly cross-examined a witness;

(5) the magistrate judge incorrectly characterized petitioner's *Miranda* claim as a Fourth Amendment suppression claim;

(6) the magistrate judge incorrectly concluded that petitioner's cumulative misconduct claim lacked merit;

(7) the magistrate judge incorrectly concluded the petitioner's Sixth Amendment

right to effective assistance of counsel was not violated; and

(8) the magistrate judge incorrectly rejected petitioner's sufficiency of the evidence claim.

(Pet.'s Objs. Rep. & Rec. 2-20.)

Where a habeas petition has been referred to a magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B), the court reviews de novo "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). After completing such review, the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."[3] *Id.*

### A.    Objection No. 1: Form of Report and Recommendation

Petitioner argues that the magistrate judge simply adopted, in nearly verbatim form, the government's response brief. Although, if true, the alleged conduct is perhaps not the best practice, the court's role is to review the merits of petitioner's claims, not the form or the style of the Report and Recommendation. The court is concerned only with substantive accuracy. Petitioner's first objection does not challenge the substantive accuracy of the Report and Recommendation, and, therefore, is overruled.

### B.    Objection Nos. 2-4, 6: Prosecutorial Misconduct

Petitioner asserts several prosecutorial misconduct claims. Significantly, "the United States Supreme Court has drawn a distinction between misconduct that, because of its capacity to

---

[3] Petitioner repeatedly asks for an independent review of his case. Petitioner, however, need not ask for such treatment, as the court is statutorily required to review de novo "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). Of course, the scope of the court's review is statutorily limited by § 2254.

divert the trier of fact from the task before it, so undermines the reliability of a verdict that it constitutes a due process violation . . . , and misconduct that implicates a specific right guaranteed by the constitution . . . ." *Marshall*, 307 F.3d at 63.  Petitioner raises both types of misconduct challenges.  Additionally, petitioner asserts that the cumulative effect of these errors justifies habeas relief.  The government contends petitioner's claims are meritless.  On direct appeal, the superior court held that each of petitioner's claims lacked merit.  The magistrate judge likewise found that the alleged constitutional violations did not justify habeas relief.  I agree.  I write merely to supplement the magistrate judge's findings.

### 1.    Failure to Testify (Objection No. 2)

Petitioner argues that on five separate occasions, the prosecutor commented on his decision not to testify, a decision that the Fifth Amendment specifically protects.  Petitioner argues these comments amount to prosecutorial misconduct.  The magistrate judge reviewed each of the statements and concluded that none of the statements constituted misconduct.  Upon de novo review of petitioner's claims, the court agrees with the magistrate judge.

The only statement worthy of further discussion is the first statement petitioner challenges.  During a car ride home from the police station with two police officers after questioning, the state court found that petitioner made this unprompted statement: "I can't believe they let me go."  During his closing argument, the prosecutor focused on this statement as evidence of petitioner's guilt, stating:

> If he didn't do anything, if his wife just shot herself, Dan, why did you say, I can't believe they let me go?  If this is really a case where the wife had the gun and pointed it, why would he say I can't believe they let me go?  Think about that.  Use your common sense.

9

The Fifth Amendment, made applicable to the states by the Fourteenth Amendment, provides in relevant part that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself." Under the Fifth Amendment, prosecutors are barred from "commenting on a defendant's failure to testify." *See Bontempo v. Fenton*, 692 F.2d 954, 958 (3d Cir. 1982) (citing *Griffin v. California*, 380 U.S. 609, 615 (1965)). More specifically, "[w]here [a] prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin* holds that the privilege against compulsory self-incrimination is violated." *United States v. Robinson*, 485 U.S. 25, 32 (1988). Viewing the disputed comment in context, the court must determine "'whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *Lesko v. Lehman*, 925 F.2d 1527, 1544 (3d Cir. 1991) (quoting *Bontempo*, 692 F.2d at 959 (internal quotation omitted)).

Contrary to petitioner's assertion, the prosecutor did not argue that petitioner's failure to testify was evidence of petitioner's guilt or comment in any way on his failure to testify; rather, the prosecutor was using one of petitioner's own statements, which was presented at trial, to suggest to the jury that he was guilty and to contradict his defense at trial. Stated another way, the prosecutor presented petitioner's astonishment regarding his release from custody as evidence of his culpability. The prosecutor did not ask that jury to make an adverse inference from petitioner's failure to explain why he made the statement. Thus, the court finds that the statement did not violate petitioner's Fifth Amendment rights and that the Pennsylvania Superior Court was correct in so ruling on direct appeal. Consequently, the court will overrule petitioner's objection.

### 2.      Additional Prosecutorial Misconduct

Petitioner asserts several misconduct claims that do not implicate a specific constitutional right.  It "'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Instead, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Id.* at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "Improper prosecutorial conduct rises to the level of constitutional error 'when the impact of the misconduct is to distract the trier of fact and thus raise doubts as to the fairness of the trial.'"  *United States v. Morena*, 547 F.3d 191, 193-94 (3d Cir. 2008) (quoting *Marshall*, 307 F.3d at 67).  In conducting this inquiry, the court must assess "the prosecutor's improper actions, the weight of properly admitted evidence and any curative instructions given by the trial court."  *Id.* (citing *Moore v. Morton*, 255 F.3d 95, 112-13 (3d Cir. 2001)).  The analysis below begins with a review of the prosecutor's statements and proceeds to an application of the above authority.

### a.      The Prosecutor's Statements[4]

### 1.      Reference to inadmissible evidence (objection no. 3)

First, petitioner asserts that the prosecutor improperly referred to inadmissible evidence.  Specifically, the prosecutor quoted from an unauthenticated notebook the phrase "if all else fails, I want to maximize damage to her," which prosecutors attributed to petitioner.  When defense

---

[4] In addition to those statements discussed in this section, petitioner also challenged the prosecutor's use of reputation evidence.  Petitioner does not object to the magistrate judge's disposition of that claim, and, accordingly, the court will not address in detail that issue.  The court did review this claim, however, and upon review, the court agrees with the magistrate judge's conclusion.

counsel objected, the trial court immediately instructed the jury to disregard the question as improper and explained that the notebook was not identified at trial as belonging to petitioner. The trial court also found that, although the prosecutor's question was improper, the notebook was not a major component of the prosecution's case. The superior court and the magistrate judge agreed.

### 2. Misrepresentation of witness's testimony (objection no. 3)

Next, petitioner contends the prosecutor misrepresented Officer DeAngelo's testimony to the jury. Officer DeAngelo testified that the victim told her at the time of another incident sometime before her death that petitioner kept a gun in his home separate from the bullets. Officer DeAngelo further testified that the victim never stated that the gun was kept in a locked box. The prosecutor, however, in his opening statement and in his closing argument referred to the gun as being "unloaded and locked" upstairs. The superior court found that the statement did not constitute misconduct because the jurors were specifically instructed to use their own recollection of the evidence, not the recollection of the attorneys. Likewise, the magistrate judge found that between the jury instruction and the lengthy closing argument, use of the word "locked" was unlikely to have a significant impact on the jury.

### 3. Cross-examination of petitioner's daughter (objection no. 4)

Lastly, petitioner argues that the prosecutor improperly cross-examined petitioner's daughter, a character witness as to petitioner's reputation as a peaceful, non-violent person, by asking a question that the prosecutor agreed not to ask. While cross-examining the petitioner's daughter, the prosecutor asked: "Aren't you aware that on a prior occasion your father threatened

12

your mother with a gun?"  The trial court immediately sustained a defense objection.  The trial

court then held a chambers conference to hear argument concerning defendant's motion for a

mistrial.  The prosecutor argued that one of defense counsel's questions "opened the door" to this

inquiry.[5]  The trial court disagreed with the prosecutor, deciding instead that a curative

instruction was appropriate.  The next day,[6] the trial court told the jury that there was no

"evidence before you that [petitioner] ever threatened his wife with a gun."  Moreover, the trial

court permitted defense counsel to recall petitioner's daughter to answer the prosecutor's

question.  Petitioner's daughter answered the question in the negative and the trial court did not

allow the prosecution to further cross-examine her on that issue.  On direct appeal, the superior

court found that the curative instruction was sufficient to remove any prejudice to petitioner.  The

magistrate judge agreed, but also suggested that the trial court improperly excluded the

prosecutor's question.

> **b.**     **Individual and Cumulative Effect of the Statements (Objection No. 6)**

Upon de novo review of these objections, the court finds that petitioner's claims do not

individually or collectively justify habeas relief.  On an individual basis, none of the prosecutor's

comments so infected the proceedings such that petitioner was denied due process.  *See Darden*,

477 U.S. at 181.  Likewise, even when viewed in the collective, the prosecutor's actions did not

---

[5] The prosecutor apparently had agreed to avoid such questioning unless the defense opened the door to the prosecutor's question.  The defense arguably opened the door when, in response to defense counsel's questioning, petitioner's daughter testified that she had not heard other members of the community discussing any violent acts committed by her father.

[6] Defense counsel requested the opportunity to review the situation overnight, prior to the judge issuing the instruction.  The next day, defense counsel renewed his motion for a mistrial, which the trial court denied.

violate petitioner's due process rights.

I first examine the prosecutor's actions on an individual basis. In each instance, the prosecutor's actions were either improper or arguably improper. Nevertheless, as I discussed above, impropriety alone is an insufficient basis for granting habeas relief. *See id.* Rather, the court's focus is properly directed to the impact of the improper statements on the entire trial. *See McCandless v. Vaughn*, 172 F.3d 255, 262 (3d Cir. 1999); *cf. Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (reminding that when "conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States"). For several reasons, none of the comments individually violates petitioner's due process rights. First, after each such comment, the trial court promptly issued a curative instruction, directing the jury to disregard the prosecutor's comments. *See Gov't of Virgin Islands v. Rosa*, 399 F.3d 283, 297 (3d Cir. 2008) (noting that court "'must assume that juries for the most part understand and faithfully follow instructions'" (quoting *Connecticut v. Johnson*, 460 U.S. 73, 85 n.14 (1983)). Second, each statement was either isolated in nature or mitigated by surrounding circumstances at trial: (1) concerning the prosecutor's reference to the notebook, an objection was sustained, an immediate curative instruction was given, and the trial court correctly found that the notebook was not a major piece of evidence in the prosecution's case; (2) the prosecutor's comments concerning whether petitioner's gun was "locked," offered once during the prosecution's opening statement and once during the closing argument, were isolated in nature, separated by an entire trial, occurred during lengthy arguments by the prosecutor, and were of minimal significance in the trial; and (3) regarding the prosecution's cross-examination of petitioner's daughter, after a stern jury instruction directing the jury that no evidence of a violent threat existed, the trial court

14

permitted petitioner's daughter to answer the question in the negative without allowing further cross-examination.  Finally, the prosecution presented a significant amount of evidence linking petitioner to the murder.[7]  As the Third Circuit has reasoned, "the stronger the evidence against the defendant, the more likely that improper arguments or conduct have not rendered the trial unfair . . . ."  *Marshall*, 307 F.3d at 69 (citing *Moore*, 255 F.3d at 119) (reasoning also that "prosecutorial misconduct is more likely to violate due process when evidence is weaker").  For these reasons, I conclude that taken individually, these three instances of misconduct do not violate due process.[8]  As a result, I cannot conclude that the state court's decision with respect to these claims was incorrect, let alone deficient to the extent required by § 2254(d).  Consequently, I will overrule petitioner's objection as it relates to these statements individually.

The cumulative effect of prosecutorial misconduct, however, can rise to the level of a constitutional violation even if the individual instances of misconduct, standing alone, do not.  *See Lesko*, 925 F.2d at 1541 (3d Cir. 1991) (finding that although prosecutor's appeal to vengeance did not itself warrant relief when considered together with another prosecutorial error, habeas relief was required).  Nonetheless, even when considering the misconduct of the

---

[7] The evidence facing petitioner included: (1) evidence demonstrating that the victim's extramarital affair gave petitioner a strong motive to commit murder; (2) numerous inculpatory statements; (3) evidence suggesting that petitioner staged the crime scene to fit his version of events; and (4) varying, inconsistent accounts of the events given by defendant, ranging from suicide to accidental shooting.  *Commonwealth v. LaBrake*, No. 0245, slip op. at 9-10 (Pa. Ct. Com. Pleas Cr. Div. Mar. 7, 2002) (internal quotation omitted).

[8] *See Moore*, 255 F.3d at 113 (reminding that "[w]hen the evidence is strong, and the curative instructions adequate, the Supreme Court has held the prosecutor's prejudicial conduct does not deprive a defendant of a fair trial"); *United States v. Shareef*, 190 F.3d 71, 79 (2d Cir. 1999) (concluding that combination of isolated nature of misconduct, curative instruction, and sufficiently strong evidence removed any prejudice defendant faced and eliminated need for new trial).

prosecutor collectively, petitioner fails to establish that the misconduct infected the trial to such an extent that his due process rights were violated.  As discussed, the trial court issued curative instructions to remedy each error, the evidence facing petitioner at trial was substantial, and the record simply does not demonstrate that these instances of misconduct were so pervasive that the entire trial was infected.  *See Walker v. Palahovich*, No. 05-0609, 2007 WL 666763, **7-8 (E.D. Pa. Feb. 26, 2007) (finding due process not violated where curative instructions and strength of the evidence against petitioner removed potential for prejudice stemming from several improper prosecutorial statements), *aff'd*, 280 F. App'x 212 (3d Cir. 2008).  Accordingly, the court concludes that petitioner's cumulative error claim is without merit, and the court will overrule petitioner's objection accordingly.

### D.    Objection No. 5: *Miranda* Violation

In his fourth claim, petitioner asserts that his due process rights and his right to a fair trial were violated when the trial court failed to suppress statements obtained in violation of *Miranda*. The magistrate judge held that under *Stone v. Powell*, 428 U.S. 465 (1976), petitioner's claim was not a cognizable claim in a habeas proceeding.  Petitioner correctly objects to the application of *Stone* to his *Miranda* claim.  In *Withrow v. Williams*, the Supreme Court held that *Stone*, which precludes habeas review of Fourth Amendment suppression rulings, does not apply to Fifth Amendment *Miranda* claims.  507 U.S. 681, 683 (1993).  Thus, the court has the power to review petitioner's *Miranda* claim.

Petitioner challenges statements he made to off-duty police officer Meissler moments after the shooting and before the on-duty police officers arrived.  Without reading petitioner his *Miranda* rights, Meissler asked petitioner what happened, and petitioner stated that he did not

remember.  Meissler then asked petitioner where he was during the shooting and whether

petitioner touched anything after the shooting.  Petitioner again stated that he did not remember.

The trial court found that petitioner was not in custody, and, therefore, admitted these statements.

On direct appeal, the superior court agreed, finding more generally that the officer's questions

were the type of "general, on-the-scene" questions that do not violate petitioner's *Miranda* rights.

The question, therefore, for purposes of habeas review is whether the state court's determination

that petitioner was not in custody was contrary to, or an unreasonable application of clearly

established federal law, or based on an unreasonable determination of the facts.  § 2254(d)(1) &

(2).

      *Miranda* serves to exclude from trial statements made by a defendant during a custodial

interrogation.  *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Thus, an individual's

*Miranda* rights apply only when that individual is "in custody" and subjected to "interrogation."

*See Illinois v. Perkins*, 496 U.S. 292, 296 (1990).  For determining "whether an individual is in

custody, the ultimate inquiry is 'whether there is a formal arrest or restraint on freedom of

movement' of the degree associated with a formal arrest.'"  *Reinert v. Larkins*, 379 F.3d 76, 86

(3d Cir. 2004) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation

omitted)).  When the individual has not been openly arrested when the statements are made,

"'something must be said or done by the authorities, either in their manner of approach or in the

tone or extent of their questioning, which indicates they would not have heeded a request to

depart or to allow the suspect to do so.'"  *Id.* (quoting *Steigler v. Anderson*, 496 F.2d 793, 799

(3d Cir. 1974) (internal quotation omitted)).  "Interrogation" for *Miranda* purposes includes

those words and actions "that the police should know are reasonably likely to elicit an

17

incriminating response" *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  Significantly, the

*Miranda* Court reasoned that its holding did not extend to "[g]eneral on-the-scene questioning as

to facts surrounding a crime or other general questioning of citizens in the fact-finding process."

*Miranda*, 384 U.S. at 477.

Here, petitioner was not subjected to the type of custodial interrogation that triggers

*Miranda*.  Petitioner was not under arrest.  Moreover, there simply is no evidence to suggest that

petitioner, who was in his own home, was restrained in any way from breaking off the encounter,

let alone restrained to a degree associated with a formal arrest.[9]  Lastly, while Meissler did ask

petitioner questions, his questions were general on-the-scene questions to which *Miranda* does

not apply.  *See Miranda*, 384 U.S. at 477.  Thus, I find that petitioner's *Miranda* rights were not

violated because *Miranda* did not apply to petitioner's particular situation.  Because *Miranda*

does not apply, I conclude that the trial court did not violate petitioner's constitutional rights by

admitting the challenged statements at trial.  As the state court reached this same result, albeit

relying on state law to do so, I cannot conclude that the state court's decision was incorrect, let

alone unreasonable under § 2254(d).  Therefore, although petitioner is correct to assign error to

the application of *Stone* to his *Miranda* claim, petitioner's *Miranda* claim nonetheless fails on the

merits.

---

[9] The trial court did exclude statements made by petitioner to the on-duty police officers and investigators who arrived at the scene after Meissler.  The suppression of these statements illustrates the intended reach of *Miranda*. While Meissler, who arrived at the scene just after the shooting, asked petitioner general, fact-finding questions about a shooting that had just taken place, the later-arriving officers questioned petitioner with a focus more in line with a formal interrogation.  *Miranda* protections exist only in the latter situation.

18

E.      Objection No. 7: Ineffective Assistance of Counsel

Petitioner raises four ineffective assistance of counsel claims, each centered on trial

counsel's failure to object to specific jury instructions.  To establish ineffective assistance of

counsel, a petitioner must show that (1) the attorney's performance was deficient, and (2) the

deficient performance prejudiced petitioner's defense.  *Strickland v. Washington*, 466 U.S. 668,

687 (1984).  To prove deficiency, a petitioner must show that counsel's performance "fell below

an objective standard of reasonableness under prevailing professional norms."  *Buehl v. Vaughn*,

166 F.3d 163, 169 (3d Cir. 1999) (citing *Strickland*, 466 U.S. at 688).  To prove prejudice, "a

petitioner must demonstrate that there is 'a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.'"  *Holland v. Horn*,

519 F.3d 107, 120 (3d Cir. 2008) (quoting *Strickland*, 466 U.S. at 694), *cert. denied*, 129 S. Ct.

571 (2008).  "It is not enough for the [petitioner] to show that the errors had some conceivable

effect on the outcome of the proceeding."  *Strickland*, 466 U.S. at 693.  Because the *Strickland*

standard is a clearly established federal law, *Taylor v. Horn*, 504 F.3d 416, 430 (3d Cir. 2007),

*cert. denied*, 129 S. Ct. 92 (2008), the question for a habeas court is whether the state court's

review of a petitioner's ineffective assistance of counsel claim was contrary to, or an

unreasonable application of, the *Strickland* standard, *Siehl v. Grace*, 561 F.3d 189, 196 (3d Cir.

2009).  Though petitioner raises four distinct jury instruction challenges,[10] only one is worthy of

---

[10] Petitioner asserts that the magistrate judge failed to address one of petitioner's
ineffective assistance of counsel claims.  Petitioner in incorrect in this assertion, as the magistrate
judge thoroughly reviewed each of petitioner's Sixth Amendment claims.  (*See* Rep. & Rec. 45-
53.)

additional consideration: claim IX.[11]

In claim IX, petitioner contends that the trial court erred when it used the word "refrain" to define "reasonable doubt."  The judge charged the jury as follows:

> Now what is a reasonable doubt?  Although the Commonwealth has the burden of proof that the defendant is guilty, this does not mean that the Commonwealth must prove the guilt beyond all doubt or to a mathematical certainty, nor must the Commonwealth demonstrate the complete impossibility of innocence. A reasonable doubt is a doubt that would cause a reasonable, careful and sensible person to *pause, hesitate, or refrain from acting* on a matter of highest importance in his or her own affair or his or her own interest.  A reasonable doubt must fairly arise out of the evidence that was presented or lack of evidence presented with respect to some element of the crime charged.  A reasonable doubt must be a real doubt.  It may not be one that is imagined or manufactured just to avoid carrying out an unpleasant duty.

"Trial courts are free to provide juries with a definition of reasonable doubt."  *Thomas v. Horn*, 570 F.3d 105, 117 (3d Cir. 2009) (citing *Victor v. Nebraska*, 511 U.S. 1, 5 (1994)).  "'So long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.'"  *Id.* (quoting *Victor*, 511 U.S. at 5 (internal citations omitted)).  When reviewing this instruction, the court's focus is on "'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet' the reasonable doubt standard."  *Id.* (quoting *Victor*, 511 U.S. at 6).

Here, petitioner does not take issue with use of the words "pause" or "hesitate."  Indeed, the use of such words to define reasonable doubt has been upheld.  *See, e.g.*, *Victor*, 511 U.S. at

---

[11] As the magistrate judge found, claims VI-VIII plainly are without merit, and the court adopts the magistrate judge's disposition of those claims accordingly.

17-22 (upholding jury instruction defining reasonable doubt as "a doubt as would cause a reasonable and prudent person, . . . to *pause and hesitate* before taking the represented facts as true" (emphasis added)); *Thomas*, 570 F.3d at 118 (noting that Supreme Court "has repeatedly approved of defining reasonable doubt as a doubt that would cause a reasonable person to hesitate to act" (internal quotations omitted)).  Instead, petitioner argues that use of the word "refrain" lessened the burden of proof imposed on the prosecution.

The Third Circuit, in *Thomas*, addressed a nearly identical issue.  In *Thomas*, the petitioner challenged the use of the phrase "restrain from acting" to define reasonable doubt, arguing that the trial court should have used the phrase "hesitate from acting."  *Id.* at 118.  Even though the court agreed with petitioner that use of the word "restrain" instead of "hesitate" lowered the burden of proof on the government, it did not consider the substituted term unconstitutional.  *See id.*  The *Thomas* court reasoned that:

> The Supreme Court has never indicated that a reasonable doubt instruction must demand as much from the prosecution as the "hesitate to act" formulation does. Instead, the Court has merely described the "hesitate to act" formulation as a "common sense benchmark for just how substantial such a doubt must be."

*Id.* (quoting *Victor*, 511 U.S. at 20-21.)  The *Thomas* court found that Supreme Court precedent merely requires that the instructions "correctly conve[y] the concept of reasonable doubt to the jury.'"  *Id.* at 119 (quoting *Victor*, 511 U.S. at 6) (alteration in *Thomas*).  When applying this standard, the *Thomas* court found that the trial court's reasonable doubt instruction properly conveyed the concept of reasonable doubt to the jury, and, therefore, held that the state court's instruction was constitutional.  *Id.* at 119-20 (finding that though the "use of the word 'restrain'" was not "ideal," it was "not enough to render the entire instruction unconstitutional").

21

Here, the instruction in petitioner's trial used the words "pause," "hesitate," and "refrain" to explain to the jury the concept of reasonable doubt.  As stated, petitioner only challenges the use of the word "refrain."  A person "refrains" when that person holds back or abstains from a particular action.  Webster's Third New Int'l Dictionary 1909 (1981) ("refrain . . . 1: to hold back . . . 2: to abstain from . . . to keep oneself from doing . . . .").  As defined, "refrain" suggests a permanent "period of inaction."  *See Thomas*, 570 F.3d at 118.  On the other hand, "hesitate" merely "implies a temporary interruption before acting."  *See Thomas*, 570 F.3d at 118; Webster's Third New Int'l Dictionary 1061 ("hesitate . . .1a: to hold back in doubt or indecision . . . b: to hold back from or as if from scruple . . .  2: to delay [usually] momentarily").  Because the definition of "refrain" implies a more permanent decision than "hesitate," the court finds that as between "hesitate" and "refrain," the latter "decreases, to some extent, the burden of proof that the prosecution would have to meet were the 'hesitate to act' formulation employed instead." *Thomas*, 570 F.3d at 118.

Nevertheless, "[i]t does not follow that any definition requiring more doubt than [the "hesitate to act"] benchmark is unconstitutional."  *Id.*  As the *Thomas* court outlined, the Supreme Court has found only one reasonable doubt instruction constitutionally deficient.  *See Cage v. Louisiana*, 498 U.S. 39, 40, 41 (1990) (holding that reasonable doubt instruction improperly required the jury to find a "substantial" doubt that gave rise to a "grave uncertainty" because this language suggested a "higher degree of doubt than is required for acquittal"), *overruled on another ground*, *Estelle v. McGuire*, 502 U.S. 62 (1991).  While use of the word "refrain" seems to require more doubt than the word "hesitate," the instruction does not, unlike the instruction at issue in *Cage*, require a higher degree of doubt than is constitutionally

22

mandated.  Indeed, "refrain" is quite similar to "restrain," which was upheld in *Thomas*, as each

word implies a prolonged and/or permanent "period of inaction."  *Id.* at 118 (finding that

"restrain" suggested a "more prolonged, if not permanent, period of inaction").  Therefore, the

court concludes that the instruction, which combines "refrain" with "pause" and "hesitate" in the

disjunctive, conveys the concept of reasonable doubt to the jury in a clear fashion, and,

consequently, does not violate the Constitution.  *See Thomas*, 570 F.3d at 118-19.

Even more importantly, petitioner's argument places too much focus on the word

"refrain" and thus ignores the syntax of the sentence he challenges.  The court framed its

definition of reasonable doubt in the disjunctive form, that is, the jury could find reasonable

doubt if "a reasonable, careful and sensible person" would: (1) pause from acting, (2) hesitate

from acting, *or* (3) refrain from acting.  Because the jury could find reasonable doubt on any of

these grounds, including the routinely upheld "hesitate from acting" ground, the court is

convinced that the instruction did not violate due process.  For these reasons, the court finds no

constitutional harm arises from the trial court's reasonable doubt instruction.  Consequently, the

court finds that petitioner's attorney did not act unreasonably by failing to object to the

instruction and the state courts did not err in concluding there was no *Strickland* violation.  The

court therefore will overrule petitioner's objection as it concerns this instruction.

### F.        Objection No. 8: Sufficiency of the Evidence

In petitioner's tenth claim, which is the subject of his seventh and final objection,

petitioner raises a sufficiency of the evidence challenge.  In *Jackson v. Virginia*, the Supreme

Court held that when reviewing a sufficiency challenge a court must determine "whether, after

reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319 (1979) (emphasis in original); *Sullivan v. Cuyler*, 723 F.2d 1077, 1083-84 (3d Cir. 1983). Upon de novo review of the record, the court agrees and therefore adopts the reasoning of Magistrate Judge Perkin. The evidence offered at trial clearly was a sufficient basis for a third degree murder conviction. Thus, the court will overrule petitioner's eighth objection.

## V.     Conclusion

In sum, I find that petitioner's first ten claims lack merit, and that his eleventh claim is procedurally barred as it is raised for the first time here. Accordingly, I will overrule petitioner's objections, adopt in substantial part Magistrate Judge Perkin's Report, and approve his Recommendation.

Finally, I must determine if I should issue a certificate of appealability. A court may issue a certificate of appealability only if the defendant "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requires that the defendant "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). According to the Supreme Court,

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Id.*

24

Petitioner's eleventh claim is subject to procedural default.  "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further."  *Id.*  Here, reasonable jurists could not disagree that petitioner's eleventh claim is subject to procedural default, and, therefore, a certificate of appealability will not issue with respect this claim.

In addition, on the basis of the record, the court finds that petitioner's remaining claims (claim I-X) are without merit.  The court is persuaded that reasonable jurists would not find this assessment debatable or wrong.  Therefore, defendant has failed to make a substantial showing of the denial of a constitutional right, and a certificate of appealability will not issue with respect to petitioner's remaining claims.